IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **COLUMBIA RIVER STEAMSHIP OPERATORS' ASSOCIATION**,<br><br>       Plaintiff,<br><br>       v.<br><br>**PORT OF ASTORIA**,<br><br>       Defendant. | Case No. 3:19-cv-1478-JR<br><br>**OPINION AND ORDER** |

**Michael H. Simon, District Judge.**

Plaintiff Columbia River Steamship Operators' Association (CRSOA) has moved for summary judgment on its claims that a fee imposed by Defendant Port of Astoria (Port) is invalid under the Tonnage Clause, the Commerce Clause, and the Supremacy Clause of the United States Constitution.[1] The Port has cross-moved for summary judgment, arguing that the fee at issue is constitutional because the Port provides a critical service to all vessels charged the fee by

---

[1] CRSOA also initially alleged that the fee violates the Rivers and Harbors Act, 33 U.S.C. § 5. CRSOA, however, withdrew this cause of action (*see* ECF 32 at 18) in light of a subsequent Ninth Circuit case holding that there is no private right of action under this statute. *See Lil' Man in the Boat, Inc. v. City & Cnty. of San Francisco*, 5 F.4th 952, 963 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 900 (2022) ("We find no indication that Congress intended to create an implied private right of action in § 5(b)(2)."). Because CRSOA has withdrawn this claim, the Court declines to address the parties' cross-motions on this issue.

PAGE 1 – OPINION AND ORDER

maintaining the only deep-water berth in the area available for emergency services. On December 8, 2021, United States Magistrate Judge Jolie A. Russo issued her Findings and Recommendation regarding the parties' cross motions.

Judge Russo recommended that the Court grant CRSOA's motion for summary judgment as to its claims under the Tonnage Clause and the Supremacy Clause and deny its motion with respect to CRSOA's withdrawn claim under the Rivers and Harbors Appropriations Act. Judge Russo also recommended that the Court grant the Port's motion for summary judgment as to CRSOA's withdrawn claim under the Rivers and Harbors Act but deny it in all other respects. Both parties timely objected, requiring *de novo* review by this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).[2]

## STANDARDS

### A. Review of Findings and Recommendation

Under the Federal Magistrates Act ("Act"), the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). If a party files an objection to a magistrate judge's findings and recommendations, "the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.*; Fed. R. Civ. P. 72(b)(3).

For those portions of a magistrate judge's findings and recommendations to which neither party has objected, the Act does not prescribe any standard of review. *See Thomas v. Arn*, 474 U.S. 140, 152 (1985) ("There is no indication that Congress, in enacting [the Act], intended to require a district judge to review a magistrate's report to which no objections are filed."); *United States. v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) (holding that the court

---

[2] The Court does not believe that oral argument would be helpful in resolving the parties' objections and thus denies Defendant's request for oral argument. *See* LR 7-1(d)(1).

must review *de novo* magistrate judge's findings and recommendations if objection is made, "but not otherwise"). Although in the absence of objections no review is required, the Act "does not preclude further review by the district judge[] *sua sponte* . . . under a *de novo* or any other standard." *Thomas*, 474 U.S. at 154. Indeed, the Advisory Committee Notes to Fed. R. Civ. P. 72(b) recommend that "[w]hen no timely objection is filed," the Court review the magistrate judge's recommendations for "clear error on the face of the record."

**B.  Summary Judgment**

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

When parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (quotation marks and citation omitted); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th

Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

## BACKGROUND

The parties state that they do not dispute the material facts of this case and that it can be decided by the Court as a matter of law. As discussed below, however, the parties dispute whether the Port provides a realistic benefit to the vessels being charged a fee by making Pier 1 available for emergency services if needed.

### A. The Fee

The Port maintains a deep-water berth at Pier 1, at the eastern part of the Port, which is the only deep-water berth near the mouth of the Columbia River capable of receiving large oceangoing vessels with deep drafts. The next-nearest deep water berth is at Longview, Washington, approximately 50 miles away.[3] To maintain its 40-foot depth, however, the berth requires constant dredging.

---

[3] The Ports of Vancouver and Portland also have deep-water berths.

On March 19, 2019, the Port's Board of Commissioners (Port Commission) unanimously approved Resolution 2019-03 (Harbor Fee Resolution), which establishes a harbor maintenance and safety fee of $300 (Harbor Fee) on large oceangoing commercial vessels. ECF 27-3 at 1-2. The Harbor Fee became effective on July 1, 2019. The Harbor Fee Resolution explains:

> The Port of Astoria maintains and operates Pier 1 in furtherance of its commercial and maritime shipping interests, and to protect public safety by: providing an emergency berth to distressed vessels; and serving as a land-based platform for emergency services to distressed vessels, including shipboard firefighting. In order to defray costs associated with maintaining and operating Pier 1, all vessels engaged in foreign, coastwise, or intercoastal trade that are 250 feet or greater in length overall, upon arriving within the jurisdictional limits of the Port of Astoria, shall be assessed a harbor fee of $300 per vessel.

*Id.* at 2. The Harbor Fee Resolution expressly exempts from the $300 fee smaller vessels, government vessels, non-commercial pleasure craft, and tugboats. *Id.* The Port deposits the revenue accrued from the Harbor Fee into a general account without separate designation. ECF 25-1 at 126.

**B.  Emergency Services**

As stated in the Harbor Fee Resolution, the Port contends that in addition to the commercial use of Pier 1 (for which the vessels using the Pier pay a separate fee), the Port maintains the deep-water berth as an emergency berth available for large vessels and as a land-based platform for emergency services. The Port calculated the Harbor Fee by estimating the cost of dredging needed to maintain the deep-water berth and dividing that cost by the estimated number of large vessels that pass by the Port and might have need of a deep-water berth in an emergency. The Port estimates that approximately 1,500 to 2,000 large vessels pass by the Port each year. ECF 25-1 at 101 (Decl. of Will Isom). In the last 20 years, out of approximately 30,000 to 40,000 large vessels passing by, the Port believes that approximately six vessels have

used Pier 1 as an emergency berth. ECF 25-2 at 4. The Port, however, could not specifically identify more than one such vessel needing an emergency berth in the past 20 years. *Id.*

CSROA contends that the Port is not genuinely using Pier 1 as a berth for emergency services or docking and that is merely a pretext in an attempt to justify the Harbor Fee. According to CSROA, the Port did not conduct any investigation, communications, correspondence, or engagement with any agency, person, or professional with any background in vessel safety to determine whether the absence of Pier 1 would jeopardize vessel safety or imperil maritime commerce on the Columbia River. ECF 25-1 at 15. CSROA also notes that the Port maintains a website that emphasizes its services, but the website does not list emergency services or an emergency berth at Pier 1, and that when creating the Port's Strategic Business Plan, the Port did not include any statement about the claimed emergency services or emergency berth at Pier 1.

CSROA also highlights that the Port has not identified any emergency service capabilities of Pier 1, other than its existence, nor has the Port investigated the feasibility or practicality of berthing at Pier 1 during an emergency. CSROA asserts many facts render Pier 1 not a feasible or practical emergency berth, including: (1) the requirement for two tractor tugs to dock and undock a vessel, which are located in Rainier or Longview, to travel four hours to Astoria at a cost of more than $82,000 for docking and undocking, whereas at Longview it costs only $21,600 for docking and undocking; (2) the lack of infrastructure and personnel with experience and capability to respond to an emergency; (3) the fact that the Port has not attempted to formulate any relationship with any local, state, or national agency first responders or specialized responders or vessel operators about how to structure the provision of emergency services or an emergency berth; (4) that Pier 1 is sometimes occupied with cruise ships and other ships and the

logistics of moving that commercial user (requiring the specialized tractor tug) to move in another vessel (also requiring the specialized tractor tug) in an emergency are less than ideal, particularly given the tractor tug logistical difficulties; and (5) that the Port has no written plan regarding the provision of emergency services or an emergency berth, such as the type of emergency that would be allowed and could be handled (e.g. hazardous materials, fire, biological).

CRSOA's materials in support of its motion include a letter from the U.S. Coast Guard Captain of the Port, stating that the Captain of the Port does not direct vessels to a specific pier and the Captain and staff could not recall ever directing a vessel to dock at Pier 1. Additionally, Captain Jeffrey A. Johnson, former Captain of the Vancouver Fire Department, and current Training and Response Coordinator for the Resolve Marine Group and Pacific Region Casualty Representative, states that Pier 1 fails to meet the ideal criteria for a Fire Suppression Berth and that the Astoria Fire Department does not have adequate resources to mount a safe and effective "fire attack" aboard an oceangoing ship on Pier 1. ECF 34 at 4 (Johnson Decl.). Further, Mitch Anderson, Ships Agency Operations Manager of the West Coast/North America, for Wilhelmsen Ships Service, states that Pier 1 is not the only dock available for emergency services or repairs for large oceangoing vessels, and he explains that other docks between Astoria and Portland are better suited even though they are not deep-water docks, including by anchoring off the dock and making repairs or emergency services and offloading sick passengers. ECF 35 at 2-3.

The Port responds that the Port Commission made its decision after consulting with the Columbia River Bar Pilots, the Astoria Police Department, and the Astoria Fire Department. The Port provides the Declaration of Captain Gary Lewin, former President and Administrative Pilot of the Columbia River Bar Pilots. ECF 28. Captain Lewis explains that nearly all oceangoing

vessels are required to take on a state-licensed Columbia River Bar Pilot when entering the Columbia River bar pilotage ground (which begins in the ocean approximately five miles west of the Oregon shoreline). Captain Lewis also states that based upon his "experience as a maritime pilot, [he believes] that the continuing viability of Pier 1 as an emergency dock for large oceangoing vessels is important for the bar pilotage ground in terms of emergency response capability." *Id.*, at 4. This is because, in his view, "Pier 1 is the only dock available to act as an emergency dock for vessel repairs, removal of critically ill passengers or crew members or to fight a shipboard fire with the firefighting equipment available from the Astoria Fire Department or some of the larger fire departments that are members of the Marine Fire and Safety Association." *Id.*

The Port also submits the Declaration of Daniel Crutchfield, Chief of the Astoria Fire Department (AFD). ECF 29. Chief Crutchfield explains that although the AFD is small, Astoria is a maritime community and he has two personnel that have complete Marine Fire Technician Training and a small firefighting vessel. The AFD also is a member of the Marine Fire and Safety Association's Fire Protection Agencies Advisory Council, giving the AFD access to specialized equipment and personnel. The AFD also is party to "automatic aid agreements" with nearby jurisdictions, providing for additional resources when needed. All of this is provided in support of Chief Crutchfield's opinion that the AFD can respond to shipboard fires with the additional resources at the AFD's disposal. Chief Crutchfield adds that AFD personnel are "highly familiar with Pier 1 as a staging ground" and that it "affords a relatively large staging and response area that that is readily accessible and can easily accommodate the large team of personnel and equipment that may be required to respond to a maritime fire." *Id.*, at 3. He thus

concludes that Pier 1 "is a critical infrastructure asset that will advance the safety of the maritime and local community by facilitating effective firefighting efforts." *Id.*, at 4.

## DISCUSSION

### A. Tonnage Clause

CRSOA contends that the $300 per passing Harbor Fee violates the Tonnage Clause, which states that no state shall lay any duty of tonnage without the consent of Congress. U.S. Const., art. I, § 10, cl. 3. The Tonnage Clause prohibits "a charge for the privilege of entering, trading in, or lying in a port." *Polar Tankers, Inc. v. City of Valdez*, 557 U.S. 1, 8 (2009) (quoting *Clyde Mallory Lines v. State of Alabama ex rel. State Docks Comm'n*, 296 U.S. 261, 265-66 (1935)). This prohibition "does not extend to charges made by state authority, even though graduated according to tonnage, for services rendered to and enjoyed by the vessel." *Clyde Mallory*, 296 U.S. at 266. In *Clyde Mallory*, the Supreme Court held that the charges at issue were for permissible regulatory services of providing policing services in a busy harbor that benefitted all vessels that entered the harbor. *Id.* at 267. "[A] charge for services rendered or for conveniences provided is in no sense a tax or a duty. It is not a hindrance or impediment to free navigation." *Keokuk N. Line Packet Co. v. City of Keokuk*, 95 U.S. 80, 84 (1877).

CRSOA argues that the Harbor Fee is distinguishable from the fee charged in *Clyde Mallory* because the Port provides no service to the vessels being charged the Harbor Fee. Instead, according to CRSOA, the vessels are merely going by the Port on their way to a point elsewhere. The Harbor Fee does not apply to vessels entering or using the dock but is imposed on every large vessel (not expressly exempt) that merely passes by Pier 1.

In terms of the prospective possible future need for "emergency services," CRSOA highlights that very few ships that have passed Pier 1 availed themselves of "emergency services" or berthing at Pier 1 to make repairs—a maximum of six out of 30-40,000. CRSOA

PAGE 9 – OPINION AND ORDER

also provides evidence that the Port has not instituted any training or expertise in emergency services or firefighting, or provided any evidence to support that the dredging that is used to maintain the deep-water berth is actually for the purported safety and emergency services rather than for commercial use to maintain the pier for ships that actually use it. CRSOA contends that a fee for ships that use the pier to offset the cost of maintaining the pier is appropriate, whereas a fee for all large ships that simply pass by is an improper (and unconstitutional) tonnage fee. Thus, CRSOA argues, this case is similar to *S.S. Co. v. Portwardens*, in which the Supreme Court noted that Louisiana's $5 fee "upon every ship entering the Port of New Orleans, to be collected upon every entry" imposed a "serious burden" upon vessels and "work[ed] the very mischief against which the Constitution intended to protect commerce among the States." 73 U.S. 31, 33 (1867).

The Port, on the other hand, argues that the Harbor Fee does not violate the Tonnage Clause because the large vessels that are charged receive a benefit from the Port's maintenance and availability of a deep-water berth that is suited to the large vessels in the event of an emergency. The Port contends that the Harbor Fee thus is not a duty of tonnage but merely a fee for services in keeping such a deep-water berth ready and available. The Port states that the smaller vessels do not particularly benefit from the deep-water berth being kept available because smaller ships can berth at many other ports in an emergency. Thus, argues the Port, the Harbor Fee is narrowly tailored to the larger vessels for which it provides a benefit.

The critical issue in determining whether the Harbor Fee violates the Tonnage Clause is whether the Port provides a service or convenience to the vessels charged the Harbor Fee with the revenue generated. The Port argues that the vessels obtain a benefit from merely having a deep-water berth *available* to use in the event of an emergency, even if nearly all of the vessels

historically have never used the berth. *See, e.g.*, *Clyde Mallory*, 296 U.S. at 266 (rejecting the argument that a fee for policing services violates the tonnage clause for vessels that never used such services because "[i]t is not any the less a service beneficial to appellant because its vessels have not been given any special assistance" and concluding that policing traffic in a busy harbor benefits all vessels); *New Orleans S.S. Ass'n v. Plaquemines Port, Harbor & Terminal Dist.*, 874 F.2d 1018, 1023 (5th Cir.), *opinion amended on denial of reh'g on other grounds*, 891 F.2d 1153 (5th Cir. 1989) ("Ships entering Plaquemines Port pay a fee to insure that emergency services will be available; this is a transaction, not a revenue device, a regulation or a payment simply to use the Port. *Clyde Mallory* holds that fees for 'services rendered to and enjoyed by the vessel' pass muster under the tonnage clause. Here, as there, not every ship paying the fee needs the service; they have paid for the assurance of its availability." (footnote omitted)); *Plaquemines Port, Harbor & Terminal Dist. v. Fed. Mar. Comm'n*, 838 F.2d 536, 545 (D.C. Cir. 1988) ("All vessels, whether or not they catch fire or need rescue services, benefit from their availability."); *id.* at 545 n.8 (noting that even though "passing" ships received a benefit from the availability of emergency services, the fee was not "rendered unconstitutional on the ground that the Port does not stop each passing ship to demand a small contribution"); *id.* at 548 n.11 (noting that "ships which pass through the Port without stopping receive some benefit yet pay no fee" but concluding that the fee remains constitutional because exempting some vessels that receive a benefit is permissible so long as the "benefits and fees have been apportioned as closely as is practicable"); *Cruise Lines Int'l Ass'n Alaska v. City & Borough of Juneau, Alaska*, 356 F. Supp. 3d 831, 843 (D. Alaska 2018) ("This case stands for the proposition that the mere availability of a service does not run afoul of the Tonnage Clause if the availability of that service is of benefit to a vessel.").

The parties dispute whether the Port, by maintaining Pier 1, genuinely provides any realistic benefit to large vessels. CSROA points out that the Port does not provide any emergency services, unlike the entity in the *Plaquemines* cases, which actually provided the emergency services. CSROA also notes that all that the Port does provide is the physical berth, and the alleged services are the dredging and maintenance needed to keep the berth open and available. Any emergency services, such as firefighting, policing, hazardous material mitigation, ship repairs, or medical intervention, would be done by third parties. The Port, on the other hand, argues that by maintaining a deep-water berth at significant expense, it is providing a benefit to large oceangoing ships by offering a physical location for the vessel to dock and the emergency services to take place if and when needed.

This case is somewhat the inverse of the situation in the *Plaquemines* cases. Here, the berth is owned by the Port and the provision of emergency services would be by third parties. In the *Plaquemines* cases, the berths were all privately owned and the Plaquemines Port, Harbor and Terminal District (District) was responsible for providing emergency services. The District charged a fee to every vessel entering the port to pay for the cost of providing emergency services. Both the D.C. Circuit and the Fifth Circuit found that the broad application of the fee to all ships entering the port, even those that did not use any emergency services, did not violate the Tonnage Clause. Notably, in discussing that all vessels entering the port received a benefit even if they did not use any emergency services, the D.C. Circuit also specifically noted that ships merely passing by also received a lesser benefit but that the District was not constitutionally required to stop every ship passing by and obtain a small contribution to the cost of providing emergency services. *Plaquemines*, 838 F.2d at 545 n.8; *id.*, at 548 n.11. Although dicta, that discussion supports the conclusion that the District could have required a contribution from all

ships passing by because those ships also received a benefit from the availability of emergency services in the area, albeit a lesser benefit than ships that entered the port.

The Court agrees with the D.C Circuit in *Plaquemines* that the availability of emergency services at Pier 1, even if not used, is a benefit to all larger vessels, including both those that enter the Port and those that merely pass by. The fact that other vessels, such as smaller vessels and otherwise exempt vessels, may also benefit from emergency services at Pier 1 would not invalidate an otherwise lawful applicable fee or detract from the benefit received by the larger vessels. *See, e.g.*, *Cruise Lines Int'l*, 356 F. Supp. 3d at 853 ("Whether a particular service provided by defendants is available to and/or used by the general public is not relevant to plaintiffs' Tonnage Clause claim. Providing facilities that constitute a service to a vessel do not become unconstitutional because of incidental/parallel use by the general public."); *Captain Andy's Sailing, Inc. v. Johns*, 195 F. Supp. 2d 1157, 1173 (D. Haw. 2001) ("Nor does a fee become a prohibited duty of tonnage just because the services provided by the fee are also used by persons not paying that fee."). Indeed, the fee upheld in *Clyde Mallory* for policing services was only levied against vessels of 500 tons or more, even though smaller vessels obtained the benefit of the policing services.

The central question here, however, is whether the Port, which does not provide the actual emergency services, still provides a service or benefit to the larger vessels merely by maintaining infrastructure that would be available to allow emergency services to be rendered to larger vessels if and when needed. Courts have accepted infrastructure projects as providing a service to vessels that do not run afoul of the Tonnage Clause, so long as the connection between the infrastructure and the charged vessels is sufficiently direct. *See, e.g. Cruise Lines Int'l*, 356 F. Supp. 3d at 852 (finding that fees for projects such as infrastructure to help passengers embark

PAGE 13 – OPINION AND ORDER

and disembark vessels benefit vessels and thus do not violate the Tonnage Clause, but fees for projects such as crossing guards and sidewalks that benefit only passengers are not permissible under the Tonnage Clause); *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 566 F. Supp. 2d 81, 88-92 (D. Conn. 2008), *aff'd*, 567 F.3d 79 (2d Cir. 2009) (reviewing all projects funded by the revenue from the challenged fee and their connection to the class charged the fee). A fee to recover costs for improvements to a wharf can be recoverable so long as it is tied to a benefit to the charged vessel—making it a user fee—as opposed to being levied on every ship, making it a fee of tonnage solely for the privilege of entering, remaining in, or departing from a port. *Keokuk*, 95 U.S. at 84-85 (stating that fees can be charged for "fa[c]ilities furnished" because providing a wharf "is rendering [vessels] a service" and compensation may be demanded "for the use of the wharf" but that "[a] passing vessel may use the wharf or not, at its election, and thus may incur liability for wharfage or not, at the choice of the master or owner" and that fees for "use of a dry-dock for repairing a vessel or demand for towage in a harbor" are of the same nature); *Cannon v. City of New Orleans*, 87 U.S. 577, 581 (1874) ("[T]he dues here claimed cannot be supported as a compensation for the use of the city's wharves, but that it is a tax upon every vessel which stops, either by landing or mooring, in the waters of the Mississippi River within the city of New Orleans, for the privilege of so landing or mooring."); *cf. Lil' Man in the Boat, Inc. v. City & Cnty. of San Francisco*, 5 F.4th 952, 961 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 900, 211 L. Ed. 2d 606 (2022) (noting that the 2002 amendment to the Rivers and Harbors Act intended to "harmonize" it with the Tonnage Clause and "prohibit fees and taxes imposed on a vessel simply because that vessel sails through a given jurisdiction" by preventing "local jurisdictions from imposing taxes and fees on vessels merely transiting or making innocent passage through navigable waters" (simplified)).

In the context of the Export Clause, the Supreme Court discussed the constitutionality of harbor fees. *United States v. U.S. Shoe Corp.*, 523 U.S. 360 (1998). The Supreme Court. invalidated the fee, concluded: "This does not mean that exporters are exempt from any and all user fees designed to defray the cost of harbor development and maintenance. It does mean, however, that such a fee must fairly match the exporters' use of port services and facilities." *Id.* at 369-70. The Supreme Court has yet to extend this holding to the Tonnage Clause, but scholars have noted that although the Export Clause generally is unique and not appropriate for extrapolation to other cases, "there is no obvious reason why that should be so" for Tonnage Clause cases because "[a] fee for services is a fee for services, regardless of the constitutional provision involved." Erik M. Jensen, *Quirky Constitutional Provisions Matter: The Tonnage Clause, Polar Tankers, and State Taxation of Commerce*, 18 Geo. Mason L. Rev. 669, 705 (2011).

The Court finds that regardless of the factual dispute about whether Pier 1 is actually an emergency berth or appropriate for emergency services, the dispositive issue here is that the Port itself does not provide any emergency services and merely dredges and otherwise maintains the pier. For that type of "service," which is really maintenance of the infrastructure of the port, the type of direct connection sufficient to support a fee that would not violate the Tonnage Clause is a fee on vessels that use the pier. *See, e.g.*, Christopher T. Cook, *Funding Port-Related Infrastructure and Development: The Current Debate and Proposed Reform*, 38 Fordham Urb. L.J. 1523, 1534-35 (2011) (discussing how fees for improvements and infrastructure are appropriate on vessels that have "availed themselves of those improvements" whereas fees for

general services such as policing and other emergency services may be upheld as reasonable "regardless of whether the ship owners availed themselves of those services").[4]

Although general services like emergency services do not necessarily require that all ships avail themselves of the service, the Court is not persuaded that because Pier 1 is necessary for any in-berth large vessel emergency services to take place, services to maintain the pier are the equivalent of the emergency services themselves. Under such reasoning, maintenance of any dock or pier could be the equivalent of any dock-related service—stevedoring, docking, embarking and disembarking passengers, loading and unloading cargo, and so forth. All of those services first require that a vessel have a location at which to dock in the port. But that does not mean that maintaining a dock is the equivalent of such services. Further, considering the very small number of ships that have used Pier 1 as an emergency berth in the past, in this case the use is so minute that it is distinguishable from the cases allowing the mere availability of services to suffice. In those cases, many vessels used the services even though some did not. Here, at most in 20 years only six out of 30,000 vessels have used Pier 1 as an emergency berth. That the overwhelming majority of vessels that are being charged the Harbor Fee have not needed the purported emergency services or emergency berth further supports that this is a fee upon every vessel that merely sails by the Port, in violation of the Tonnage Clause. Given the miniscule chance that a large vessel will need to use Pier 1, charging vessels simply for passing by that do not even enter the Port creates much more than a "slight divergence between the class that benefits and the class that pays." *Plaquemines*, 838 F.2d at 545 n. 8.

---

[4] There may be some infrastructure or maintenance services that are appropriate for a universal fee regardless of use, *see Cruise Lines Int'l*, 356 F. Supp. 3d at 853, but the Court finds the maintenance of Pier 1 does not fall within such a category.

PAGE 16 – OPINION AND ORDER

B.  Commerce Clause

CRSOA also argues that the Harbor Fee violates the Commerce Clause, U.S. Const., art. I, § 8, cl. 3. The parties agree that the three-prong test set forth in *Plaquemines* applies:

> (1) The service funded by the fee must enhance the safety and efficiency of interstate and foreign commerce, ensuring that the fee will not interfere with the purposes of the commerce clause; (2) the fee must be used to pay for the service, reinforcing the assumption of the market participant exception, that the Port will charge what the market would allow; (3) the fee can place at most a small burden on interstate and foreign commerce.

874 F.2d at 1021 (citing *Clyde Mallory*, 296 U.S. at 267-68).

The Port's $300 Harbor Fee is to maintain the deep-water berth. If Pier 1 is a viable emergency berth and location for emergency services, then it would enhance the safety and efficiency of interstate and foreign commerce. The parties, however, dispute the facts regarding whether Pier 1 actually can viably serve as an emergency berth. Thus, this factor cannot be resolved at summary judgment.

Regarding the second prong, CRSOA contends that the fee does not pay for the service because it goes into a general fund. The Court disagrees. The Port Commission took the cost of dredging Pier 1 and divided it by the number of large vessels estimated to pass in a year. The fee is directly connected to the cost of dredging Pier 1.

Regarding the third prong, in CRSOA's motion, it conceded that the $300 per vessel fee "is unlikely to significantly alter the viability of Columbia River maritime commerce." ECF 24 at 21. Instead, CRSOA argued before the magistrate judge that if every other port took this same approach, then there might end up being an effect on maritime commerce.[5] The Court rejects this argument as unreasonably speculative.

---

[5] CSROA made this argument in responding to the Port's motion for summary judgment. ECF 32 at 15. In objecting to the Finding and Recommendations, CSROA raises a new

PAGE 17 – OPINION AND ORDER

There is a genuine dispute as to material fact about whether Pier 1 can be used as an emergency berth or for emergency services. Thus, whether the Harbor Fee violates the Commerce Clause cannot be resolved at summary judgment. Because the Court grants CRSOA's claim under the Tonnage Clause and declares invalid the Harbor Fee on that ground, the Court need not resolve CRSOA's claim under the Commerce Clause.

## C. Supremacy Clause

CRSOA's Supremacy Clause claim is derivative of its other causes of action. If the Harbor Fee interferes with or is contrary to federal law (including the Tonnage Clause), then it is invalid under the Supremacy Clause. Because the Court has found that the Harbor Fee violates the Tonnage Clause, it violates the Supremacy Clause. The Court grants CRSOA's motion on this claim and denies the Port's motion.

## CONCLUSION

The Court adopts the conclusion of the Findings and Recommendation (ECF 40) for the reasons discussed in this Opinion and Order but declines to adopt the remainder of the Findings and Recommendation. Instead, for the reasons stated in this Opinion and Order, on *de novo* review the Court GRANTS IN PART CRSOA's motion for summary judgment (ECF 24) with respect to CRSOA's claims under the Tonnage Clause and the Supremacy Clause and denies the

---

argument, asserting that the $300 fee assessed against an estimated 1,500 to 2,000 vessels each year would result in $450,000 to $600,000 in fees, which significantly alters the viability of Columbia River maritime commerce. ECF 44 at 5. CSROA, however, does not provide any estimate of the overall volume of Columbia River maritime commerce against which to assess the estimated $450,000 to $600,000 burden. Regardless, the Court exercises its discretion to decline to consider CSROA's new argument raised for the first time in its objections to the Findings and Recommendation. *See Jones v. Blanas*, 393 F.3d 918, 935 (9th Cir. 2004) (discussing the district court's discretion on whether to consider new arguments raised in objections).

PAGE 18 – OPINION AND ORDER

motion in all other respects. The Court also DENIES the Port's cross-motion for summary judgment (ECF 26).

**IT IS SO ORDERED.**

DATED this 16th day of May, 2022.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge